## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* sanofi-aventis US LLC,<br><br>               Plaintiff,<br><br>vs.<br><br>MYLAN INC. and MYLAN SPECIALTY L.P.,<br><br>               Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

## COMPLAINT

1.      Sanofi-aventis US LLC ("Sanofi" or the "Relator") brings this action as a *qui tam* relator on behalf of the United States of America against Mylan Inc. and Mylan Specialty L.P. (collectively, "Mylan" or "Defendants"), pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 and the Patient Protection and Affordable Care Act of 2010, to recover damages, penalties, attorneys' fees and other relief.  Mylan holds the exclusive rights to sell EpiPen and EpiPen Jr. (collectively, "EpiPen"), brand-name epinephrine auto-injectors ("EAIs"), in the United States. For nearly a decade, Mylan has knowingly misclassified EpiPen under the Medicaid Drug Rebate Program in order to defraud the United States Government and avoid payment of hundreds of millions of dollars in Medicaid rebate payments.

2.      The allegations set forth in this Complaint have not been publicly disclosed within the meaning of the FCA, as amended.  31 U.S.C. § 3730(e)(4).  In the alternative, if the Court finds that there was a public disclosure of such allegations before the filing of this Complaint, Relator is an original source as that term is used in the FCA.  *Id.*

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

4.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside in, transact business in and/or have committed acts related to the allegations in this Complaint in the District of Massachusetts.

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1391, and 28 U.S.C. § 1395(a), because Defendants reside in and/or transact business in this District by, among other things, selling pharmaceuticals, including EpiPen, directly or through wholesalers with the knowledge that those pharmaceuticals will be dispensed to Medicaid recipients.

6.      To Relator's knowledge, there are no prior complaints against Defendant alleging similar facts related to Defendants' knowing misclassification of EpiPen for purposes of the calculation and payment of Medicaid rebates.

7.      Prior to the filing of this Complaint, Relator made substantive disclosures, including in person on October 31, 2014, to the Government of facts and evidence underlying the allegations in this Complaint.

8.      This action is filed in camera and under seal pursuant to the requirements of the FCA.

## PARTIES

9.      Plaintiff and the real party in interest is the United States of America.

10.     Plaintiff-Relator sanofi-aventis US LLC is a Delaware limited liability company with its principal place of business in New Jersey.  Relator previously marketed and sold an EAI under the brand-name Auvi-Q.  Relator has standing to file this suit pursuant to 31 U.S.C. § 3730(b)(1).

11.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan Inc. manufactures, markets, and sells pharmaceuticals through its wholly-owned subsidiaries.  In 2012, Mylan Inc. changed the name of its wholly-owned subsidiary Dey Pharma, L.P. to Mylan Specialty L.P.  On information and belief, Mylan Inc. controls, directs and thus "causes" Mylan Specialty L.P.'s conduct.

12.     Defendant Mylan Specialty L.P. is a Delaware limited partnership with its principal place of business in Morgantown, West Virginia.  Mylan Specialty L.P. owns the exclusive rights to sell EpiPen in the United States, the exclusive license to use EpiPen-related trademarks, and holds the relevant National Drug Codes ("NDCs") for EpiPen products.

## THE FEDERAL FALSE CLAIMS ACT

13.     The FCA creates liability for "any person who," among other things:

    a.  "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

    b.  "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

    c.  "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

    d. "knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the

government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the

Government." 31 U.S.C. § 3729(a)(1)(G).

14.    The FCA further provides that any person who violates the FCA "is liable to the

United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted

by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of

damages which the Government sustains because of the act of that person." 31 U.S.C. §

3729(a)(1).

15.    The FCA provides that "the terms 'knowing' and 'knowingly' – (A) mean that a

person, with respect to information – (i) has actual knowledge of the information; (ii) acts in

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of

the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31

U.S.C. § 3729(b)(1).

16.    The FCA provides that "the term 'claim' – (A) means any request or demand,

whether under a contract or otherwise, for money or property and whether or not the United

States has title to the money or property, that— (i) is presented to an officer, employee, or agent

of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or

property is to be spent or used on the Government's behalf or to advance a Government program

or interest, and if the United States Government— (I) provides or has provided any portion of the

money or property requested or demanded; or (II) will reimburse such contractor, grantee, or

other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

17.     The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

18.     The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

<h3 style="text-align:center">MEDICAID DRUG REBATE PROGRAM OVERVIEW</h3>

19.     "Medicaid is a joint federal and state program that helps with medical costs for some people with limited income and resources."
https://www.medicare.gov/Pubs/pdf/11306.pdf.

20.     Each state has its own Medicaid program, which is partially funded by the United States Government.  The federal government's share is referred to as the Federal Medical Assistance Percentage ("FMAP") and varies depending upon the per capita income of each state. "The regular average state FMAP is 57%, but ranges from 50% in wealthier states up to 75% in states with lower per capita incomes (the maximum regular FMAP is 82%)."
https://www.medicaid.gov/medicaid-chip-program-information/by-topics/financing-and-reimbursement/financing-and-reimbursement.html.

21.     In order to ensure that Medicaid does not pay more for prescription drugs than private payers, Congress enacted the Medicaid Drug Rebate Program.  Today, NDC holders are

required to participate in the Medicaid Drug Rebate Program in order for their drugs to be
covered by Medicaid.

22.     As part of their participation in the Medicaid Drug Rebate Program, NDC holders
execute a rebate agreement with the Department of Health and Human Services ("HHS"), a
pricing agreement "administered by the Health Resources and Services Administration, and a
master agreement with the Secretary of Veterans Affairs."  https://www.medicaid.gov/medicaid-
chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-rebate-
program.html.

23.     The Centers for Medicare & Medicaid Services ("CMS") administers the
Medicaid Drug Rebate Program.

24.     Pursuant to the Program, NDC holders are responsible for submitting the correct
product classification, along with accurate pricing data, to CMS on a quarterly basis for each
dosage form and strength of the product so that CMS can calculate the amount of rebates that are
owed by the NDC holder.  This pricing data is generally submitted by the NDC holders through
CMS's Drug Data Reporting (DDR) for Medicaid System.

25.     Each quarter, NDC holders pay rebates "on a quarterly basis to states," which "are
shared between the states and the Federal government to offset the overall cost of prescription
drugs under the Medicaid Program."  https://www.medicaid.gov/medicaid-chip-program-
information/by-topics/benefits/prescription-drugs/medicaid-drug-rebate-program.html.

26.     Specifically, 42 U.S.C. §1396r-8 states that all "manufacturers" of covered drugs
are required to enter into rebate agreements with each state Medicaid plan and provide
information to CMS concerning their covered drugs.  In turn, 42 C.F.R. § 447.502 defines the
term "manufacturer" as "any entity that possesses legal title to the NDC for a covered drug or

biological product and . . . [i]s engaged in the packaging, repackaging, labeling, or distribution of covered outpatient drug products . . . ."

27.    The amount of the rebates owed by an NDC holder varies depending on whether the drug is classified as an "innovator" or "non-innovator" drug.

28.    "Innovator" drugs are further broken down depending on whether they are single source drugs ("S" drugs) or, if generics are available, innovator multiple source drugs ("I" drugs). The amount of rebates for S and I drugs are calculated in the same way.

## RELEVANT REGULATORY SCHEME AND GUIDANCE

29.    During the time period covered by this Complaint, the Food and Drug Administration ("FDA") and CMS have consistently maintained that a drug that is sold pursuant to an NDA and that received patent protection should be classified as a single source or an innovator multiple source drug.

30.    In that regard, CMS regulations in effect until April 1, 2016 provided that "a covered outpatient drug that is produced or distributed under an original NDA approved by the FDA, including a drug product marketed by any cross-licensed producers or distributors operating under the NDA . . . ," should be classified as a single source drug.  42 C.F.R. § 447.502.

31.    The same regulations provided that "a multiple source drug that was originally marketed under an original new drug application (NDA) approved by the [FDA], including an authorized generic drug," should be classified as an innovator multiple source drug.  42 C.F.R. § 447.502.

32.    Finally, the regulations provided that "(1) a multiple source drug that is not an innovator multiple source drug; (2) a multiple source drug that is marketed under an abbreviated

NDA or an abbreviated antibiotic application; or (3) a drug that entered the market before 1962 that was not originally marketed under an original NDA," should be classified as a non-innovator drug. *Id.*

33.    In 2007, the FDA issued guidance regarding the implementation of certain Medicaid rebate policies and, as provided by the relevant regulations, stated that all products sold pursuant to an NDA should be classified as innovator drugs.  Specifically, the guidance stated:

> "Comment: One commenter asked us to define the term NDA....
> Another commenter asked us to define the term 'original NDA'
> [which is used in the definition of innovator drugs under the
> statute].
> *        *        *
>
> "Response:  The FDA has extensive information about the NDA
> process on its Website.... We do not see a need to add a definition
> of NDA to this final rule.  Further, the FDA does not make a
> distinction between an NDA and an original NDA; therefore, we
> view these terms as having the same meaning."

72 Fed. Reg. 39142, 39163 (July 17, 2007).

34.    In 2010, CMS issued two separate Bulletins reaffirming it position that products sold under an NDA are innovator drugs and specifically requesting that companies take steps to ensure that their products are correctly classified:

> "We are requesting manufacturers to review the drug category of
> their reported products to ensure the accuracy of the data submitted
> to CMS. In general, those products that are approved under a New
> Drug Application (NDA) need to be reported to CMS as either
> single source (S) or innovator multiple source (I) and those
> products approved under an Abbreviated New Drug Application
> (ANDA) need to be reported to CMS as non-innovator multiple
> source (N)."

Medicaid Drug Rebate Program Bulletin for Participating Drug Manufacturers, Release Nos. 80, 82 (Jan. 5, 2010; Nov. 1, 2010).

35.    Finally, on January 21, 2016, CMS issued a Covered Outpatients Drugs final rule with comment, 81 C.F.R. §5170, again affirming that drugs sold pursuant to an NDA and that enjoy patent protection should be classified as single source or innovator multiple source drugs.

36.    In doing so, CMS also reaffirmed its previously issued guidance and expressly incorporating elements of it in the definitions of single source drug, innovator multiple source drug, and non-innovator drug, incorporating elements of the guidance in the definitions.

37.    Under the Covered Outpatients Drugs final rule, single source drug is defined as follows:

> *Single source drug* means a covered outpatient drug that is produced or distributed under an original NDA approved by FDA and has an approved NDA number issued by FDA, including a drug product marketed by any cross-licensed producers or distributors operating under the NDA. . . . For purposes of this definition and the MDR program, an original NDA means an NDA, other than an ANDA, approved by the FDA for marketing, unless CMS determines that a narrow exception applies.

38.    Under the same rule, a multiple source drug is defined as follows:

> *Multiple source drug* means, for a rebate period, a covered outpatient drug for which there is at least one other drug product which meets the following criteria:
>
> (1) Is rated as therapeutically equivalent as reported in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" which is available at http://www.accessdata.fda.gov/scripts/cder/ob/.
>
> (2) Is pharmaceutically equivalent and bioequivalent, as determined by the FDA.
>
> (3) Is sold or marketed in the United States during the rebate period.

39.    The rule further defined an innovator multiple source drug as follows:

> *Innovator multiple source drug* means a multiple source drug that was originally marketed under an original new drug application (NDA) approved by FDA, including an authorized generic drug. It

also includes a drug product marketed by any cross-licensed producers, labelers, or distributors operating under the NDA . . . . For purposes of this definition and the Medicaid drug rebates (MDR) program, an original NDA means an NDA, other than an Abbreviated New Drug Application (ANDA), approved by the FDA for marketing, unless CMS determines that a narrow exception applies.

40.    Finally, the rule defined a non-innovator multiple source drug as follows:

*Noninnovator multiple source drug* means:

(1) A multiple source drug that is not an innovator multiple source drug or a single source drug;

(2) A multiple source drug that is marketed under an ANDA or an abbreviated antibiotic drug application;

(3) A covered outpatient drug that entered the market before 1962 that was not originally marketed under an NDA;

(4) Any drug that has not gone through an FDA approval process, but otherwise meets the definition of covered outpatient drug; or

(5) If any of the drug products listed in this definition of a noninnovator multiple source drug subsequently receives an NDA or ANDA approval from FDA, the product's drug category changes to correlate with the new product application type.

41.    The "narrow exception" referred to in the definitions of a single source and an

innovator multiple source drug is described as follows:

There may be very limited circumstances where, for the purposes of the Medicaid Drug Rebate (MDR) program, certain drugs might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug. For example, certain parenteral drugs in plastic immediate containers, for which FDA required that an NDA be filed, might be more appropriately treated, for purposes of the MDR program, as if they are marketed under an ANDA and classified as a noninnovator multiple source drug. . . . We plan on issuing additional guidance on the scope of these very limited circumstances in the future. In the meantime, we remind manufacturers that these limited circumstances constitute very narrow exceptions to the rule that drugs marketed under NDAs (including section 505(b)(2) NDAs), other than ANDAs, should be classified as either single source or

> innovator multiple source drugs. For example, the narrow
> exception will not be considered applicable to drugs . . . that
> received patent protection or statutory exclusivity.

42.     On May 2, 2016, CMS issued additional guidance regarding the

exception. https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-

Topics/Benefits/Prescription-Drugs/Downloads/Rx-Releases/MFR-Releases/mfr-

rel-098.pdf, stating:

    a. "Drugs that received patent protection or statutory exclusivity,
       regardless of whether the protection or exclusivity is currently in
       effect" do not qualify for the narrow exception."

    b. "[M]anufacturers may not rely upon previous communications from CMS
       regarding Drug Category reporting . . . to justify their classification."

    c. Drugs sold pursuant to an NDA should be reported as a single source or innovator
       multiple source, as applicable, until CMS has made its determination.

    d. Manufacturers must submit their materials requesting the narrow
       exception by March 31, 2017.

43.     CMS has not determined and, based on the Covered Outpatients Drugs final rule

and related guidance, it appears unlikely it will, that EpiPen falls within the "narrow exception"

noted in the definitions of a single source and an innovator multiple source drug.

### OVERVIEW OF REBATE CALCULATIONS

44.     The amount of rebates owed under the Medicaid Drug Rebate Program are

determined based on a product's classification and the pricing data provided by the NDC holder

to CMS.

45.     As a general rule, rebates owed and paid to Medicaid on innovator drugs are

substantially greater than rebates owed and paid to Medicaid on non-innovator drugs.

46.     NDC holders of innovator drugs are required to pay both a base rebate and an

additional rebate.

47.    CMS regulations in effect until April 1, 2016 provided that the base rebate for innovator drugs was calculated by multiplying the number of units sold for each dosage form and strength by the greater of (a) the difference between the average manufacturer's price ("AMP")[1] and the best price ("BP") offered to commercial customers; or (b) 23.1% of the AMP. 42 U.S.C. §§ 1396r-8(c)(1)(A) - (B).

48.    The additional rebate for innovator drugs was calculated by multiplying the amount, if any, that the drug's AMP has risen more quickly than the rate of inflation as determined by the National Consumer Price Index for Urban Consumers.

49.    NDC holders of non-innovator drugs are required to pay a base rebate only.

50.    The base rebate for non-innovator drugs was calculated by multiplying the number of units sold for each dosage form and strength by 13% of the AMP.

51.    Although there were some changes in the methodology for calculating Medicaid rebates commencing April 1, 2016,[2] rebates paid for innovator drugs remain significantly higher than rebates paid for non-innovator drugs – primarily because of the additional rebate (i.e., the penalty for increasing prices more quickly than the rate of inflation) and the need to account for BP (i.e., discounts offered to private payers).

## EPIPEN

52.    Anaphylaxis is a serious, life-threatening allergic reaction. It can occur in anyone at any time, and is often caused by exposure to environmental allergens, including insect stings,

---

[1] The AMP is "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting any customer prompt pay discounts." 42 U.S.C. §1396r-8(k)(1).

[2] For example, AMP is now defined as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to retail community pharmacies and retail community pharmacies that purchase drugs directly from the manufacturer." 41 C.F.R. § 447.504. The BP is now defined as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity in the United States in any pricing structure (including capitated payments), in the same quarter for which the AMP is calculated." 42 C.F.R. § 447.505(a).

certain foods (such as peanuts), or medications.  The American College of Allergy, Asthma and Immunology estimates a lifetime prevalence of up to 2,000 episodes of anaphylaxis per every 100,000 people in the United States.[3]

53.    Epinephrine is the first-line of treatment for patients suffering from anaphylaxis. Epinephrine is generally self-administered at the onset of anaphylaxis using an EAI.  Failure to timely administer epinephrine can result in death.  Therefore, individuals who are at risk for anaphylaxis generally carry a pair of EAIs at all times in case one dose is not enough.  Many schools in the United States keep EAIs on premises for use in case of emergencies.

54.    Since the early 1990's, EpiPen has enjoyed over a 90% share of the EAI market.

55.    EpiPen's primary competitors in the EAI market have been Andrenaclick and Auvi-Q.

56.    The original EpiPen device was launched in 1980 by Meridien Medical Technologies ("MMT").

57.    MMT licensed the exclusive worldwide rights to EpiPen to Dey Pharmaceuticals ("Dey").

58.    In 2003, King Pharmaceuticals ("King") acquired MMT and assumed the Dey licensing agreement.

59.    In 2007, Mylan acquired Dey, which became the subsidiary of Mylan that was recently rebranded in 2012 as Mylan Specialty L.P.

60.    In 2011, Pfizer acquired King and assumed the Mylan licensing agreement.

61.    Today, Pfizer's MMT subsidiary manufactures EpiPen, which is marketed and sold exclusively by Mylan in the U.S.

---

[3]Phil Lieberman, M.D., *et al.*, *Epidemiology of Anaphylaxis: Findings of the American College of Allergy, Asthma and Immunology of Anaphylaxis Working Group*, Annals of Allergy, Asthma & Immunology (Nov. 2006).

62.    As the exclusive U.S. seller of EpiPen, Mylan is the holder of the following NDC codes: 49502-500-01 for EpiPen; 49502-500-02 for EpiPen 2-Pack; 49502-501-01 for EpiPen Jr.; and 49502-501-02 for EpiPen Jr. 2-Pack.

63.    As the NDC holder, Mylan is responsible for the submission of accurate information regarding EpiPen to CMS for purposes of the Medicaid Drug Rebate Program.

64.    Mylan has a history of taking extremely aggressive approaches toward its submission of information to CMS. In fact, Mylan has settled several cases regarding the submission of inaccurate information to the Medicaid Drug Rebate Program.

65.    In *United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. AstraZeneca Pharm., LP, et al.*, No. 06-CV-231-PB (D. N.H.), a *qui tam* suit under the FCA, it was alleged that Mylan and other pharmaceutical companies knowingly "reported to the Federal government that certain of their prescription drugs ... are non-innovators, when in truth, they are innovators," in order to lower the amount of rebates paid to pursuant to the Medicaid Drug Rebate Program. In 2009, Mylan agreed to pay $118 million to resolve the allegations that Mylan had knowingly misclassified 20 drugs as non-innovators between March 30, 2000, and March 31, 2005. The settlement did not include EpiPen, the rights to which Mylan acquired in 2007.

66.    In other matters, it similarly has been alleged that Mylan violated federal and/or state FCA statutes by knowingly submitting inaccurate pricing data to CMS in order to lower the amount of rebates that it was required to pay. This includes the following:

    a.    *The Commonwealth of Massachusetts v. Mylan Lab., Inc., et al.*, No. 03-CV-11865-PBS (D. Mass.) – Mylan agreed to pay $2.6M to settle the matter; and

   b. *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Actavis Mid Atlantic*

      *LLC, et al.*, No. 08-10852 (D. Mass.) – Mylan agreed to pay $57M to settle the

      matter.

## MYLAN HAS MISCLASSIFIED EPIPEN

67.    Under the Medicaid Drug Rebate Program, Mylan is responsible for submitting

accurate data concerning EpiPen each quarter to CMS because (1) Mylan holds the exclusive

license to distribute EpiPen in the U.S.; (2) the Medicaid Drug Rebate Data File lists Mylan's

subsidiary, Mylan Specialty L.P., as the labeler and NDC holder for EpiPen; and (3) the National

Drug Code Directory likewise, at all relevant times, listed either Dey, which was acquired by

Mylan in 2007, or Mylan Specialty L.P. as the NDC holder for EpiPen.

68.    EpiPen should be classified as an innovator drug because Mylan markets EpiPen

under NDA No. 019430 and enjoys patent protection through 2025 as the licensee under patents

7449012, 7794432, 8048035, and 8870827.

69.    For the entire time period covered by this Complaint and through the present,

Mylan has knowingly and intentionally submitted false information to CMS by misclassifying

EpiPen as a non-innovator multiple source drug each and every quarter for each dosage form and

strength of EpiPen, all in order to lower the amount of rebates Mylan owed and paid to

Medicaid, and to thereby increase its profits.  Indeed, to this day, in violation of its ethical and

legal obligations, Mylan has continuously misclassified EpiPen as a non-innovator multiple

source drug.

70.    Mylan also is aware that its two competitors in the EAI market classify their

respective products as innovator drugs.  Amedra has classified Adrenaclick as a single source

drug and sells it under NDA No. 020800.  Sanofi classified Auvi-Q as a single source drug and sold it under NDA No. 201739.

71.     Mylan's knowledge, intent and motive regarding this ongoing scheme to defraud Medicaid is evidenced by various actions it or its predecessors have taken to preserve EpiPen's market share.

72.     Mylan is aware that EpiPen's previous owners filed lawsuits against entrants into the EAI market to protect EpiPen's patent so that EpiPen would continue to enjoy its exclusivity and to delay other entrants into the EAI market.  As discussed above, CMS has consistently stated that a drug that is sold pursuant to an NDA and that enjoys patent or other market protection should be classified as single source or innovator multiple source drug, not a non-innovator drug.

73.     Mylan has gone to great lengths to demonstrate that EpiPen is unique and that competing EAIs should not be substituted for it. However, to qualify as a multiple source drug, and therefore, a non-innovator drug, Mylan must demonstrate that at least one other drug is: (a) therapeutically equivalent; (b) pharmaceutically equivalent and bioequivalent; and (c) was sold during the rebate period.

74.     Mylan is aware that EpiPen, Auvi-Q and Adrenaclick are not considered therapeutically equivalent. In that regard, the Orange Book lists EpiPen, Auvi-Q and Adrenaclick as having the therapeutic equivalence code "BX," which means that there is insufficient data and "the drug products are presumed to be therapeutically inequivalent until the Agency has determined that there is adequate information to make a full evaluation of therapeutic equivalence."[4]

---

[4] http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=019430&TABLE1=OB_Rx;
http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=020800&TABLE1=OB_Rx;

75.     To capitalize on this information, Mylan has created marketing materials

emphasizing that, even in states that permit pharmacists to substitute BX products based on their

professional judgment, pharmacists should only dispense EpiPen. *See, e.g.*, Roy A. Wolf,

Medical Director Mylan Specialty LP, *Analphalxis, Epinephrine Auto-Injectors, and Importance*

*of the BX Rating* (Apr. 18, 2014), *available at*:

http://www.uspharmacist.com/content/d/feature/c/47920/.

76.     Mylan also has funded a study that concluded that "Auvi-Q failed to meet the

bioequivalence threshold when using partial area under the curve (AUC) analyses based on zero

to Tmax recommended for highly variable drugs such as epinephrine." *See*

http://www.ncbi.nlm.nih.gov/pubmed/23610523. Although Relator disagrees with the findings

in this study, Mylan used the study to suggest to prescribers and users that EpiPen and Auvi-Q

are not substitutable.

77.     Finally, Mylan's motive for misclassification is vividly demonstrated by its

actions in the commercial market, where Mylan has leveraged the substantial savings it has

realized through underpayment of Medicaid rebates to preserve its dominance in the private

market by offering customers favorable commercial terms in exchange for exclusivity or for

relegating its competitors to "third-tier" status.

78.     Relator first became aware that Mylan was misclassifying EpiPen in or around

2013 when several of Relator's customers in the private payer market reported that Mylan was

severely undercutting Relator's pricing in exchange for exclusivity – *i.e.* in exchange for

agreements that would preclude other EAIs from being listed on certain formularies. One such

---

http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=201739&TABLE1=OB_RX;
http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm.

customer informed Relator that Mylan was paying a smaller Medicaid rebate than Relator had believed.

79.     In April 2012, Relator had analyzed EpiPen's estimated rebate as part of Auvi-Q's pre-launch preparation based on the assumption that Mylan had classified EpiPen as an innovator drug.  The analysis was repeated in January 2013.  Relator estimated that if EpiPen was properly classified, the EpiPen mandated rebate would be between 75-80%.

80.     In May 2013, months after the first sale of Auvi-Q, Relator's employees met with a potential customer that manages certain state Medicaid formularies.  During that meeting, when discussing Mylan's ability to offer favorable commercial terms in exchange for exclusivity, Relator's employees were informed that Mylan was paying a Medicaid rebate of less than 50%.

81.     After that meeting, another one of Relator's employees stated that he had received similar feedback from certain commercial payers that Relator's commercial discounts were not competitive with Mylan's commercial discounts.

82.     Mylan extended these discounts in order to block EpiPen's competitors from key drug formularies, including from certain key private payer formularies, major state Medicaid formularies (such as Tennessee and Texas), and certain schools.  For certain other formularies, Mylan offered deep discounts in exchange for relegating Auvi-Q to "third-tier" status.

83.     Because of Relator's extensive experience in the pharmaceutical industry, Relator was aware that such large discounts could significantly impact the amount owed under the Medicaid Drug Rebate Program.  Specifically, Relator was aware that discounts of the magnitude that Defendants were offering would not be economically reasonable if EpiPen was properly classified as an innovator drug.

84.     Relator believes that Mylan has misclassified EpiPen in order to avoid the steep penalties that it would incur in the form of significantly greater rebates each time that Mylan implemented its steep price increases and/or offered its steep rebates in order to undercut its competition.

85.     Mylan's desire to eliminate its competition in order to have free reign to charge whatever it wants for EpiPen is evident.  For example, Mylan implemented a significant price increase the day after Relator announced its recall of Auvi-Q in 2015 and Mylan has continued to increase its prices since that time.

86.     Indeed, in the time that Auvi-Q has been off the market, Mylan has taken such significant price increases that several news outlets have expressed concern about the risk of patient harm.  For example, some articles have reported instances where patients were keeping expired EpiPens because they could not refill their prescriptions.  Other articles have noted that hospitals and EMTs were exploring manual administration of epinephrine using syringes because of the extraordinary cost of EpiPen following Mylan's egregious price increases.[5]

87.     Based on Relator's extensive experience in the pharmaceutical industry, Relator is aware that Mylan's ability to take such massive price increases and otherwise sharply undercut competition would be significantly minimized if EpiPen was properly classified under the Medicaid Drug Rebate Program.

### COUNT 1 (Federal False Claims Act)

88.     Relator repeats and realleges the allegations set in the preceding paragraphs.

89.     By failing to properly report EpiPen as an S product, Mylan has, in each and every quarter for each dosage form and strength of EpiPen: (1) failed to correct its

---

[5] *See, e.g.*, https://www.denverpost.com/2016/07/13/epipen-price-hike-allergies/; http://katu.com/news/local/the-rising-cost-of-life-saving-epipen-allergy-shots-has-patients-doctors-concerned.

misclassification of EpiPen; (2) submitted insufficient data for CMS to properly calculate the rebate owed to the United Stated Government; and (3) substantially underpaid rebates owed to the United States Government.

90.    Defendants' long-standing and ongoing misclassification of EpiPen is especially egregious and, at minimum, reckless or deliberately indifferent for several reasons:

a.    The FDA and CMS have issued clear guidance on multiple occasions since Mylan acquired EpiPen and have consistently maintained that drugs sold pursuant to an NDA that enjoy patent protection must be classified as innovators.

b.    Mylan has a long history of misclassifying its products and, thus, is well aware of its legal obligations under the Medicaid Drug Rebate Program.

c.    Both of Mylan's competitors' products are properly classified.

d.    Mylan has questioned the substitutability of other EAIs for EpiPen in its marketing materials – demonstrating that Mylan itself believes EpiPen is a single source drug.

e.    Mylan has used its ill-gotten savings to unfairly sustain its advantage in the competitive market by offering customers deep discounts in exchange for exclusivity, thereby denying consumers a choice of medications for a life-threatening condition.

f.    Mylan has misclassified EpiPen so that it can implement price increases with impunity and avoid paying the additional rebate.

91.    This misconduct violates several provisions of the FCA:

a.  § 3729(a)(1)(A) creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

b.  § 3729(a)(1)(B) creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

c.  § 3729(a)(1)(C) creates liability for any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

d.  § 3729(a)(1)(G) creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

92.    Pursuant to the FCA, Mylan is thus "liable to the United States Government for a civil penalty . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

93.    Based on Relator's preliminary estimates, Relator believes that Mylan has underpaid rebates by hundreds of millions of dollars.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.    That Defendants are enjoined from misclassifying EpiPen;

B.    That the Court enter judgment against Defendants and in favor of the United States and the Relator in an amount equal to three times the amount of damages caused by

Defendants' misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount;

      C.      That Relator be awarded the maximum amount permitted under 31 U.S.C. § 3730(d), along with all costs and expenses incurred as well as attorneys' fees; and

      D.      That the Court award such other relief as the Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Relator requests a jury trial.

July **29**, 2016

                                      Respectfully submitted,

                                      Robert M. Thomas, Jr. (BBO #645600)
                                      THOMAS & ASSOCIATES

                                      20 Park Plaza, Suite 438
                                      Boston, MA  02116--4322
                                      (617) 371-1072
                                      Fax: (888) 676-7420
                                      Email: rmt@thomasandassoc.net

                                      Suzanne E. Durrell (BBO #139280)
                                      DURRELL LAW OFFICE

                                      180 Williams Avenue
                                      Milton, Massachusetts 02186
                                      (617) 333-9681
                                      Fax: (617) 333-0014
                                      Email: suzanne.durrell@verizon.net

                                      *Counsel for Relator*